## AS TO THE TERM OF A GAS AND OIL CONTRACT.

### Circuit Court of Wood County.

### NORTH WESTERN OHIO NATURAL GAS CO. v. ISAAC WHITACRE ET AL.

#### Decided, October 28, 1892.

*Gas and Oil—Construction of Contract for Drilling and Operating Wells—Term of Contract for Producing Wells Not Extended by Payments of Rental on Non-Producing Well—Right of Lessee to Terminate the Agreement.*

A contract granting the exclusive right to drill and operate gas and oil wells for the term of three years from the date thereof and as much longer as oil and gas are found in paying quantities, in consideration for which the operators were to pay a royalty on the oil produced and $300 per well for gas, and in case no well be drilled within the first six months then a stipulated rental per year, terminates upon the expiration of three years, unless oil or gas is produced in paying quantities. Payment of yearly rental and tender of $300 per year for a non-producing gas well will not effect an extension of its terms; neither will a separate agreement upon consideration three years and eight months after the date of the contract, granting an extension to a fixed date more than a year in the future, the terms of which are endorsed on the original agreements, continue the original contract in force beyond such fixed date, especially since no new or further efforts were made to develop oil or gas on the premises.

BENTLEY, J.; SCRIBNER, J., and HAYNES, J., concur.

This case has been submitted to us upon the pleadings and the testimony. The action was brought by the plaintiff, the gas company, to enjoin the principal defendant, Priddy, from drilling wells on a certain farm of Isaac Whitacre for the purpose of obtaining gas or oil; the gas company claiming that, by a prior grant to one Vandergrift, Mr. Whitacre had granted the exclusive right to bore for gas and oil upon his farm and that that right by assignment had come to the plaintiff, the gas company.

It will be necessary to consider briefly the contract upon which the plaintiff relies.   The contract was made July 16, 1886, between Isaac Whitacre of the first part and T. J. Vandergrift of the second part, and I will read certain of the paragraphs which will bear upon the discussion arising in this action. The contract reads:

"That the said party of the first part for the consideration of the covenants and agreements hereinafter mentioned, has granted, demised and let unto the party of the second part, his heirs or assigns, for the purpose and with the exclusive right of drilling and operating for petroleum and gas all that certain tract of land situated in Bloom township, Wood county, Ohio." [And here follows a description of the land, containing seventy-two acres be the same more or less, together with the right to use sufficient water therefrom necessary to the operation thereof.]

"The right-of-way over said premises, the right to lay pipes to convey oil and gas, and the right to move any machinery or fixtures placed on said premises by the party of the second part.

"The party of the second part, his heirs or assigns, are to have and to hold the said premises for and during the term of three years from the date thereof and as much longer as oil or gas is produced or found in paying quantities thereon.

"In consideration of said grant the said party of the second part agrees to give or pay to the said party of the first part, the full equal one-eighth part of all the petroleum or rock oil produced or found on said premises, and to deliver the same free of expense into tanks or pipe lines to the credit of the party of the first part, and should gas be found in sufficient quantities to justify marketing the same, the consideration in full to the party of the first part shall be $300 per annum for the gas from each well so long as it shall be sold therefrom.

"It is further agreed that the party of the second part shall complete a well on the above described premises within six months from the date hereof, and in case of failure to complete such well within such time, the party of the second part agrees to pay to the party of the first part for such delay, a yearly rental of $1 per acre on the premises herein leased from the time of completing such well as above specified until such well be completed, the said yearly rental amounting to $72 shall be deposited to the credit of the party of the first part in the Farmer's National Bank of Findlay, Ohio, or be paid direct to said first party. And a failure to complete such a well or to make such deposit

or payment as above mentioned shall render this lease null and void and to remain without effect between the parties hereto.''

There are certain other clauses in the contract which are not necessary to the understanding and disposition of the case here.

This well which the lease provides should be completed within six months or a payment made, was not completed within the six months, but before the six months expired the alternative was acted upon, the $72 rental was paid to Mr. Whitacre, that being paid in January, 1887, and before the six months had expired. A well, however, was completed upon the premises about May, 1887, before a year from the date of the lease had expired. When that well was ''drilled in,'' as the saying is, it seemed to furnish quite a quantity of gas, but with the gas a small quantity of oil so as to practically destroy the utility of the gas. The gas however was turned into the company's gas line a few hours one evening when an illumination was being held in Toledo, and the gas was used for that purpose a few hours and was then turned off. The gas has never been used from the well since that time.

In the fall of that year, the well was driven still deeper and produced perhaps another supply of gas—the quantity is not shown with any degree of certainty—and the well drilled still deeper until a vein of salt water was struck. That was in the fall of 1887. Shortly after, the casing was pulled out which let surface water into the well, and the gas was sufficient in the well it seems to throw the water out of the well—the water being projected in such quantities that it flooded a portion of Mr. Whitacre's land, and some complaint seems to have been made regarding it, and the assignees of the contract attempted to shut off the water. They attempted to shut off the salt water by a lead plug and perhaps were reasonably successful in that, but the other water being furnished in such quantities, caused some damage, it is claimed by the Whitacres, and they attempted to shut this off by putting stones in the well and pounding them down; that seemed of no avail, so at last they put the casing back into the well. It would appear for the purpose of enabling them to shut off this water more effectually, more or less stone was put into the well to stop the flow of water, and the well has remained

substantially in that condition ever since; the gas not being used and no attempt being made to use it; the gas company left it in that way.

That substantially states the situation of this well and the operation upon that farm under this contract, until March 22, 1890. It will be noticed that this was three years and eight months after the date of the lease, the original lease being for three years with this contingency for an extension. Eight months after that definite date had elapsed, a further arrangement was made between the parties. On the date I have last mentioned, the owner of the land, Mr. Whitacre, and the gas company, entered into this arrangement: the company paid him $175 for an extension of the lease and he granted and consented to an extention in these words:

"March 27, 1890. In consideration of the sum of $175 to me in hand paid by the N. W. O. N. Gas Co., I hereby agree to the extention of the within lease for and until the first of May, 1891. Signed, Isaac Whitacre."

The extension was written at the same time upon each of the duplicates of the contract, or upon the contract, and the copy is substantially the same, possibly with the variation of a word or two, which is not material.

Nothing was done further regarding this matter between the parties after this extension to May 1, 1891, until May 10, 1891, when the company by its agent tendered to Mr. Whitacre $300 in money for the rental for the gas mentioned in the contract, the contract providing for $300 each year for gas which should be produced and sold. Mr. Whitacre refused this tender, claiming that the contract had expired. On July 29, 1891, Mr. Whitacre granted another contract or oil lease, covering the same premises, to the defendants, Priddy & Bro. They immediately proceeded to erect their rig and began to drill a well on the premises, until they were stopped by the commencement of this action, and an injunction obtained thereunder; the petition being filed September 15, 1891, and the injunction being served either that day, or the day following. All operations were suspended for a time, and on April 19, 1892, the plaintiff again

tendered to Mr. Whitacre the $300 for the gas, as he claimed, which Mr. Whitacre again refused.

On that state of facts it is claimed by the plaintiff that this injunction should be made perpetual; on the part of the defendants that its lease had expired before the beginning of this action and that Mr. Whitacre had released the premises and had elected to treat the contract as at an end; and the answer of Mr. Whitacre as well as the answer of the Priddys asks that the Priddys' exclusive right to drill and operate for oil and gas be adjudged to them and that their title be quieted.

Naturally the inquiry is suggested here, and the question is presented, what were the rights of the natural gas company, assuming now for the moment that it had acquired all the rights that were originally granted to T. J. Vandergrift at the time this extension was made, and before the extension was made; and then again what rights did that extension give them?

At the time this extension was made, the well had been completed and the $72 had been paid, so the whole matter had been disposed of. There is nothing in the lease which would forfeit it for the non-completion of that well or the non-payment of the rental; the rental had been paid and the well completed. At the expiration of the three years, as the lease stated, it would seem clear that the contract and lease terminated, unless at that time there was oil or gas produced or found in such paying quantities on the premises as wou'd extend it under the clause of the lease providing that it shall extend as much longer as oil or gas is produced or found in paying quantities thereon.

That in fact this well produced oil or gas in paying quantities, there is no proper proof. We think it follows under the rulings of the Supreme Court in the cases of *Scioto Fire Brick Co.* v. *Pond,* 38 O. S., 65, and *Cook* v. *Andrews,* 36 O. S., 174, that if plaintiff desired to found any right upon the fact that oil or gas was produced in paying quantities, it was bound to furnish that proof, the burden of proof being upon it. So, I say, there is not furnished us proper proof that at the time of this extension the original lease did continue in force by reason of that alternative presented by the original contract; that is, the three

years had expired and gas or oil not shown to be produced or found in paying quantities so as to extend the lease. Practically, under the terms of the lease, the rights of the parties had ended at the time of this extension. But this extension so made did extend the lease until the first of May, 1891, but we think this can scarcely be said to extend the provisions of the six months' clause of the lease, because the first well had been drilled and the rental paid to excuse it being drilled within six months. We think this term "first of May, 1891," fixes the terms of the lease as being this date, and not three years from the original date which had been originally fixed. That the lease should be considered now as if it originally read "that it should expire by the first of May, 1891."

It is argued, and not without force, by the defendant's counsel, that, whereas the original contract presented one term for three years and another conditional term dependent upon the production of oil or gas in paying quantities, the parties by this extension waived all the conditional terms and should fix it so that it would expire in May, 1891. While, as I say, that argument is not without force, yet we are inclined to think that this should stand and be considered as in place of three years, and this would extend the lease to May, 1891, and if by that time oil or gas had been produced in paying quantities, under the original terms of the lease, the right should be considered as extended as long as the gas or oil was produced in paying quantities upon the land. Now was it?

There was nothing by way of operation done at this time, May, 1891; but it is argued as perhaps the principal basis of the plaintiff's right, that, whereas the contract was extended to the first of May, 1891, and whereas there was a well on the premises producing some gas, it would make no difference to the land owner whether the gas has in fact been found by the producer or not, as long as the producer was willing to pay the price of it—$300 a year; and as he was willing and tendered that price, it continued the lease in force as if another well had been drilled and completed prior to the first of May, 1891. Now, if this position of the plaintiff's counsel should prevail, it

would result in this: that as long as $300 was paid by the plaintiff, the exclusive right to drill for oil and gas on the premises was continued in the plaintiff, and that without any limit—no limit at all of any number of years or any circumstances, except the will of the plaintiff as long as he would pay.

By the original lease, however, while the term was undeterminate if gas or oil was produced, yet the land owner had seen fit to provide that this should continue as long as gas or oil was produced in paying quantities. There was a circumstance that he had a right to rely upon, that at some time he could terminate the lease. It might be said that gas or oil could not last forever, and that when it ceased, it would terminate the contract, but if the contract and condition are to be enlarged, there would be no limit in that regard. We think that he has a right, and has an interest in knowing the fact itself, whether oil or gas is to be found in paying quantities, and that this lease can not be indefinitely extended by the mere will of the plaintiff company in paying him $300 a year.

Now the fact is, as we think it clearly established by the defense, that this gas was not being produced in paying quantities; and he, having the right to have his rights determined as to that fact, finds that this extension to May 1, 1891, was not continued further by the fact of his having obtained or rather by the fact that the plaintiff was willing to treat it as if it had been obtained in paying quantities, and paid for it, so that when in July, 1891, after May 1, 1891, extension has elapsed, this owner's rights to his premises had been restored to him, and he had the right and the authority to grant to other parties, and it seems that he did so.

We think the rights of Priddy as claimed in the case must prevail over the alleged rights of plaintiff; that plaintiff's petition must be dismissed at its costs, and that as to the prayer that the rights of the Priddys be quieted, we see no reason why that prayer should not be granted, and an order will be made accordingly. There will be a special mandate to the court of common pleas for execution and costs.